IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| N.R., I.E.C.G., M.V.A., J.V.T., and E.A.G.V, on their own behalves and on behalf of their minor children, S.N.M.M., A.C.C., B.V.M., V.E.V.H., and Y.Y.G.P., | ) ) ) ) ) | Civil Action No. |
| Plaintiffs, v. | ) ) ) ) | |
| United States of America, | ) ) ) | |
| Defendant. | | |

## COMPLAINT

### INTRODUCTION

1.    This action is brought by five minor children (S.N.M.M., A.C.C., B.V.M., V.E.V.H., and Y.Y.G.P.)[1] seeking compensation for damages suffered when the United States government forcibly separated these children from their parents when they entered the United States together.  Each of the child Plaintiffs (hereinafter "child Plaintiffs" or "Plaintiff children") was separated from their parents and deprived of their parents' love, care, and support for significant periods of time.

2.    This action is also brought by the parents of the forcibly separated children – Plaintiffs  N.R., I.E.C.G., M.V.A., J.V.T., and E.A.G.V (hereinafter "parent Plaintiffs" or "Plaintiff parents")  – who also seek damages caused by the United States government's

---

[1] Concurrent with filing this Complaint, Plaintiffs are filing a motion for leave to proceed under pseudonyms in this case.

separation of them from their children.

3.     After they were cruelly separated, the Plaintiff parents and children were not allowed to communicate in any way for weeks or months.  The parents did not know where their children were, or even if they were safe.  And the children – as young as 4 years old – were terrified and did not understand what was happening to them.

4.     Named Plaintiff N.R. was even told by a U.S. governmental official to give a hug to his daughter when they were separated because N.R. would "never see her again."

5.     The United States government separated these parents from their children as part of a family separation policy designed by the administration of former President Donald Trump to inflict severe emotional distress with the goal of deterring parents and children from seeking asylum in this country.

6.     The government understood the harm it was inflicting upon the separated parents and children; indeed, it separated the families not despite this harm, but because of it.  The government intended to use the terror inflicted on the Plaintiff parents and children – and others separated at the border – to deter other families from migrating to the United States.

7.     Plaintiff parents and children suffered, and continue to suffer, physical, mental, and emotional harm because of the intentional, reckless, and negligent acts and omissions of U.S. government policymakers at the highest levels, and of other federal actors.

8.     The Biden Administration has condemned "the human tragedy that occurred

when our immigration laws were used to intentionally separate children from their parents…."[2] Yet the Biden Administration, in response to actions such as this, continues to defend the legality of the family separation policy and deny remedies to its victims.

9.      The child Plaintiffs and parent Plaintiffs (collectively, "Plaintiffs") bring their claims against the United States government under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.* ("FTCA").

JURISDICTION AND VENUE

10.     This Court has jurisdiction over this claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1), and has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331.

11.     Plaintiffs have exhausted their FTCA claims. Plaintiffs filed all required administrative forms with the relevant agencies of the United States of America more than six months ago. There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

12.     A substantial portion of the acts and omissions giving rise to the claims occurred in this district. Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).

---

[2]    See Executive Order on the Establishment of Interagency Task Force on the Reunification of Families, Feb. 2, 2021, available at https://www.whitehouse.gov/briefing-room/presidential-actions/ 2021/02/02/ executive-order-the-establishment-of-interagency-taskforce-on-the-reunification-of-families/ (last accessed on April. 20, 2021).

**PARTIES**

13.    Plaintiffs are Guatemalan and Honduran nationals who currently reside in the United States.

14.    The parent Plaintiffs bring this action on behalf of themselves and their minor children, the child Plaintiffs.

15.    Plaintiff S.N.M.M. was 8 years old on January 27, 2018 when she was detained by U.S. Customs and Border Protection ("CBP") with her father, N.R., after crossing the border in Arizona.

16.    Plaintiff A.C.C. was 4 years old on January 8, 2018, when he was detained by CBP with his mother, I.E.C.G., after crossing the border in Arizona.

17.    Plaintiff B.V.M. was 9 years old on May 11, 2018 when she was detained by CBP with her father, M.V.A., after crossing the border in Arizona.

18.    Plaintiff V.E.V.H. was 13 years old on or about May 19, 2018 when he was detained by CBP with his father, J.V.T., after crossing the border in Arizona.

19.    Plaintiff Y.Y.G.P. was 4 years old on or about November 27, 2017 when she was detained by CBP with her father E.A.G.V., after crossing the border in Arizona.

20.    Each of the named child Plaintiffs were forcibly separated from their parents by the U.S. government within hours or days of being detained by CBP.

21.    At all relevant times, Plaintiffs were monolingual Spanish speakers.[3]

22.    Defendant United States of America is a proper defendant in this action under

---

[3]  Some of the child Plaintiffs have since learned some English in school.

the FTCA. *See* 28 U.S.C. §§ 1346(b), 2671, *et seq.*

23.    The United States is sued for the Plaintiffs' personal injuries, caused by the wrongful acts or omissions of its employees, including employees of the Department of Health and Human Services' Office of Refugee Resettlement; the Department of Homeland Security (DHS) and its constituent units, CBP, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"); and the contractors that the agencies directly supervised. Those employees and contractors were acting within the scope of their employment under circumstances in which the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the places where the act or omission occurred. *See* 28 U.S.C. § 1246(b).

24.    The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

25.    High-ranking officials from the White House Office, DHS, HHS, and DOJ worked together to design and implement the unlawful and unconstitutional family separation policy, pursuant to which the Plaintiffs were subject to significant harm.

**STATEMENT OF FACTS**

**A.    The Government's Family Separation Programs**

26.    Curbing the number of individuals seeking asylum in the United States was a central focus of the Trump Administration's immigration policy.[4]

---

[4] *See, e.g., U.S. Judge Bars Trump Administration from Enforcing Asylum Ban,*

27.     Beginning in February 2017, DHS officials began considering a policy of separating parents and children arriving at the U.S.-Mexico border as a means of deterring the arrival of asylum seekers at this border.  On March 3, 2017, press reports showed that DHS had been considering this policy, which DHS acknowledged in a statement explaining that "the Department of Homeland Security continually explores options that may discourage those from even beginning the journey" north from Central America to the U.S. Border.[5]

28.     To that end, between July and November 2017, the government established a family separation pilot program in CBP's El Paso sector, through which it targeted for criminal prosecution parents who crossed the border with children. It detained the parents and forcibly took their children away from them, designated the children as unaccompanied minors (despite their having arrived with their parents), and placed the children in the custody of ORR, a component of HHS. Through this initiative, the government separated nearly 280 families between July and November 2017.

---

CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephenmiller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylumseekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a33217240a539_story.html; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019.

[5] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-childrenidUSKBN16A2ES.

29.    By late 2017, the government was separating families along the length of the U.S.-Mexico border, including families arriving in the United States outside the El Paso sector.[6]  Plaintiffs were among those families separated outside of the El Paso sector, in Arizona.

30.    Despite concerns raised by prosecutors, judges, and other stakeholders about the implementation of the pilot initiative in the El Paso sector, on April 6, 2018, then Attorney General Jeff Sessions announced that the government would institute a "Zero Tolerance" mandate, requiring the prosecution of all persons who crossed the United States border between ports of entry.[7]

31.    On May 4, 2018, citing "recent presidential direction and guidance from the Attorney General," the DHS Secretary signed a memorandum directing Border Patrol sector to "refer for prosecution all adults apprehended for crossing the border illegally," expressly including parents who entered the United States with their children.[8]

32.    Intending the separations to inflict harm and cause a deterrent effect, the United States government put no mechanism in place to reunify separated families following the completion of the parent's criminal sentence.[9]

---

[6] *See Ms. L. v. U.S. Immigrations and Customs Enf't*, 310 F. Supp. 3d 1133, 1142-45, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019).

[7] *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry*, Dept. of Justice (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[8] DOJ OIG Report II, 17-18.

[9] See id. at 14 n.30; *Ms. L v. ICE*, 310 F.Supp.3d 1133, 1140-41 (S.D. Cal. 2018) ("[T]here was no procedure in place for the reunification of these families.").

33.    The Administration knew family separation would cause enormous trauma to the children and parents. Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate. Administration officials at the highest levels thus planned and implemented a practice of separating families both knowing that the practice would cause severe harm to the people it affected and specifically intending that it would cause such harm.[10]  For example:

a.    In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[11]

b.    Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the practice that

---

[10]  *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017),    https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); see also Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post, June 19, 2018, https://www.washingtonpost.com/ news/politics/wp/2018/06/19/here-are-the-administration-officialswho-have-said-that-family-separation-is-meant-as-a-deterrent/.

[11]  U.S. Immigration & Customs Enf't, Dep't of Homeland Sec., Rep. of the DHS Advisory Committee on Family Residential Centers 2 (2016), available at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[12] Administration officials ignored Commander White's warnings.

c.    In March 2017, several DHS officials told the press that the department was considering a program of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States.[13] The day after the press report, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared children.[14]

34.    Despite the dire warnings about the effects of this practice, numerous high-

---

[12]    Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administrationwas-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White).

[13] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-childrenidUSKBN16A2ES.

[14] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-pressroom/                    Pages/ immigrantmotherschildrenseparation.asp.

level officials publicly admitted that family separation was the express guiding principle and that its purpose was to harm asylum seekers arriving in the United States so as to deter future asylum seekers. For instance: When an NPR reporter asked about the program on May 11, 2018, John Kelly, President Trump's then-Chief of Staff, responded that "a big name of the game is deterrence. It could be a tough deterrent."[15] As for the children affected, he said: "[t]he children will be taken care of — put into foster care or whatever."[16]

35.    On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[17]

36.    Accordingly, from 2017 and throughout much of the Trump Administration, senior government officials made the express choice to intentionally cause parents (including the Plaintiff parents here) and children (including the Plaintiff children here) extraordinary pain and suffering in order to accomplish the government's objectives.

37.    A Physicians for Human Rights ("PHR") investigation, based on psychological evaluations of asylum-seeking parents and children who were separated by

---

[15] *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interviewwith-npr.

[16] *Id.*

[17] Philip Bump, *Here are the Administration Officials Who Have Said that Family Separation is Meant as a Deterrent*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-theadministration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

the U.S. government in 2018, found the U.S. government's treatment of asylum seekers through its family separation policy constituted cruel, inhumane, and degrading treatment and, in all cases evaluated by PHR experts, rose to the level of torture.[18]

38.    Family unity is a fundamental principle of child welfare law and recognizes that in order to thrive, children must remain in the care of their families where they are loved, nurtured, and feel safe. As such, the separation of each of the Plaintiff parents from each of their respective Plaintiff children violated all of the Plaintiffs' constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents, *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

39.    ICE and CBP have well-established legal obligations to ensure the prompt

---

[18]    *You Will Never See Your Child Again: The Persistent Psychological Effects of Family Separation*, PHR (February 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf ("PHR Report"); *see also United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Dec. 10, 1984, 1465 U.N.T.S. 85, 113; S. Treaty Doc. No. 100-20 (1988) (defining torture as an act 1) which causes severe physical or mental suffering, 2) done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence). In the cases that PHR documented, U.S. officials intentionally carried out actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner. *See* PHR Report.

release of minors in their custody and to favor preserving family unity whenever possible. *See Flores v. Reno*, CV 85-cv-4544, ECF. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* consent decree remains binding on the United States and significantly limits the circumstances, duration, and manner of immigration detention of minor children.

40.     The *Flores* consent decree imposes standards for the treatment of detained minors and recognizes their vulnerability of being detained without a parent or guardian. It requires, among other matters, that immigration officers permit minors contact with family members who were arrested with the minor. DHS and its agents violated its obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity and instead needlessly separating the Plaintiff parents and their respective Plaintiff children from each other.

41.     Defendant failed to track parent and child relationships and communicate with parents, including the Plaintiff parents here, about their children's whereabouts and safety.

42.     In fact, the agencies primarily responsible for implementing the family separation policy, ORR and DHS, instituted no "consistent way to indicate in their data systems children and parents separated at the border" until at least the summer of 2018.

43.     El Paso sector CBP officials raised concerns to CBP headquarters about the lack of functionality to track family separations in their computer systems but headquarters failed to make any changes in response to those concerns.[19]

---

[19] *Id.* at 14-15.

44.    The U.S. government was thus on notice at least as of November 2017 that government databases could not properly track families once the child was separated from the parent.  It was also aware that DHS component agencies needed to better coordinate with each other and with ORR before a vast expansion of family separation across the length of the U.S. southern border.  But the government went forward with its policy of mass family separation despite these identified defects and without making necessary improvements to its IT system.

45.    CBP entered inaccurate and incomplete information in its systems, including failing to link parents and children as separated families.  The most staggering result of this failure was that the United States government had no ready records of where thousands of parents' children were located, and could not properly reunite parents and children, even when ordered to do so by a federal judge.

46.    As predicted by John Kelly, ORR staff then placed the children in "foster care or whatever." The "whatever" included placement of many children in ORR facilities throughout the United States.

47.    When the children were separated, the government classified them as "unaccompanied," even though they had been accompanied by their parents when they arrived in the United States seeking asylum and remained accompanied until the government separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied alien children." *See* 6 U.S.C. § 279(a).

48.    The Plaintiff parents suffered physically, mentally, and/or emotionally during the separation from their children.

49.    Likewise, the Plaintiff children separated from their parents suffered physically, mentally, and/or emotionally. This trauma was aggravated by the fact that children did not understand why they had been separated.

50.    Serious psychological harm to children and families was a foreseeable result of DHS's implementation of the forced family separation policy.

51.    It was within the government's power to prevent separation through use of alternatives to detention, to reduce the duration of separation through a reunification plan, and to ensure timely information about the wellbeing, whereabouts, and contact information for children and parents by setting up appropriate information and communications channels.

52.    Instead, the U.S. government took no reasonable measures to minimize the predictable psychological harms which resulted from its program to separate parents and children.

53.    In many cases, individuals employed by the U.S. government similarly did not take additional measures to prevent these harms.

54.    The government's failure to utilize proper record keeping of the separated families led to more chaos. As emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy, the agencies' failure to coordinate tracking of separated families was a

"startling reality" given that:

> [t]he government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property. Certainly, that cannot satisfy the requirements of due process.

*See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part, denied in part sub nom. Ms. L. v. ICE*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).

55.    On June 26, 2018, in *Ms. L*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days. *Id.* at 1149.

56.    Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the children didn't know where the parents were. And the government didn't

know, either."[20] Judge Sabraw found that the government's family separation violated the constitutional right to family integrity.[21]

57.    As evidenced by Administration officials' statements that the program's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this program to intentionally inflict emotional distress on the parents and children whom it separated. It succeeded, with devastating consequences for Plaintiffs.

**B.    Plaintiffs come to the United States and are detained and separated from each other.**

*I.E.C.G. and A.C.C.*

58.    After crossing the border in Arizona, being detained, and then spending approximately 24 hours with his mother I.E.C.G. in detention, A.C.C. was separated from his mother on January 9, 2018 by Defendant.

59.    Upon hearing that that they would be separated from each other, I.E.C.G. and

---

[20]    Transcript of Status Conference at 58, Ms. L., No. 18-cv-00428 DMS MDD (S.D. Cal. July 27, 2018), ECF No. 164.

[21]    See *Ms. L. v. U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1161-1167 (S.D. Cal. 2018 (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

A.C.C. both began to cry. A.C.C. grabbed his mother I.E.C.G. and held onto her, but they were still separated from each other.

60.    I.E.C.G. was not told where her son would be taken; A.C.C. was simply taken away by the government agent(s). It was a heart-breaking moment for both I.E.C.G. and A.C.C., causing extreme distress and persistent pain and suffering to both.

61.    Not knowing where her son was, I.E.C.G. felt tremendous sadness and desperation. She was constantly worried about whether A.C.C. was safe, whether he was eating and sleeping properly, and how he was feeling. She felt extremely nervous and had difficulties sleeping and eating, among other things.

62.    I.E.C.G. was detained for approximately twenty days, in detention facilities which were extremely cold and for which she was not given appropriate clothing (such as a sweater).

63.    After being separated from his mother, A.C.C. was placed into the custody of the DHHS' Office for Refugee Resettlement, Administration for Children and Families, Division of Unaccompanied Children's Services (DUCS).

64.    On January 10, 2018, DUCS transported A.C.C. to New York where he was placed in the care of Cayuga Centers.

65.    Because he was only 4 years old when he was separated from his mother (A.C.C.'s birthday is the 17th of January), A.C.C. was unable to answer almost all questions during his intake with Cayuga Centers.

66.    A.C.C. was unable to understand how or why he had been separated from his

mother's custody. For much of his time in DUCS custody, A.C.C. believed he had been deliberately abandoned by his family.

67. When asked, A.C.C. frequently expressed his desire to return to his mother in Guatemala.

68. A.C.C. was not released into his father's custody until June 8, 2018, nearly five months after he was separated from his mother.

69. The psychological impact of I.E.C.G. and A.C.C.'s separation has been significant for both of them. A.C.C., who was a very young child at the time of the separation and detention, suffered from fear, anxiety, and uncertainty every day of his separation from his mother.

70. A.C.C. continues to struggle as a result of the separation from his mother. A.C.C.'s behavior was affected by the separation. When he was reunited with his family, he was pale, he had lost weight, he did not want to eat, and he cried a lot. He was afraid to go to school and was afraid to be alone. He was also afraid because of injections he had received during the time he was detained. The effects continue.

71. I.E.C.G. also continues to suffer from the experience of being separated from her son.

### N.R. and S.N.M.M.

72. On or about January 2018, soon after N.R. and his daughter S.N.M.M. arrived at the hielera (a cold room within the immigration detention facility), a male U.S. governmental agent approached them and said that S.N.M.M. would not be permitted to

stay with her father and that she would be taken away from N.R. because they had entered the country illegally. This agent told N.R. to give S.N.M.M. a hug, because he would never see her again. N.R. felt helpless, as if his soul was being taken away from him. He and S.N.M.M. both began to cry. This made him want to die. After N.R. hugged his daughter, the agent took her away.

73.    N.R. had no idea where his daughter would be taken. This was one of the most painful moments of his life, and it caused both N.R. and S.N.M.M. extreme distress and persistent pain and suffering.

74.    After the separation, N.R. was transferred to a facility in Yuma, Arizona, where he was detained for over one month. He was subsequently detained in several facilities, including ICE or Bureau of Prisons detention facilities in Florence, Arizona and Theo Lacy, California, and a detention facility N.R. knew as El Rancho, which was also in California.

75.    Conditions at the detention facilities in California were bad. At the facility in Theo Lacy, guards threatened to beat N.R. unless he washed the other detainees' clothes. At some point while he was detained in Theo Lacy, N.R. developed an infection, which made it very difficult for him to move quickly. He was ill for over ten days and was treated with antibiotics. During the period when N.R. was ill, a male guard told him to move more quickly while he was walking in a line of detainees, but N.R. was unable to do so because of his illness. The guard took N.R. out of the line and asked him to kneel. N.R. was in so much pain that he could not fold his legs properly, but the guard forced him to kneel

anyway. The guard then hit him in the chest, knocking him to the ground. After that day, guards threatened to beat N.R. again if he did not wash the other detainees' clothes.

76.    During this period, N.R. repeatedly asked government officers at these facilities, both orally and in writing, to tell him where his daughter was and to let him communicate with her. Despite those multiple requests, N.R. was kept in the dark about where his daughter was for months. During that period, he felt as if his life was falling apart, and he had difficulty eating and sleeping.

77.    Approximately two or three months after he had been separated from S.N.M.M., and while he was detained in California, N.R. learned that his daughter was in foster care at Cayuga Centers in New York.

78.    On only one occasion while he was detained, N.R. was permitted to speak to S.N.M.M. They spoke for approximately seven minutes. S.N.M.M. told N.R. that she had been wondering where he was, that she needed him and wanted to live with him, and that she didn't want to be where she was anymore. Both N.R. and S.N.M.M. were weeping during this call, their first communication in months and the last time they would communicate for many more months.

79.    S.N.M.M. also suffered abuse during her time in the U.S. The daughter of S.N.M.M.'s foster parent at Cayuga Centers pushed and physically hurt S.N.M.M. on at least two occasions.

80.    N.R. repeatedly asked agents at the facilities where he was detained to be permitted to speak to S.N.M.M. again, but his requests were ignored or denied.

81.    Officials had been repeatedly pressuring N.R. to drop his asylum claim and to sign a document so indicating, telling him that he would not see S.N.M.M. again unless he did so. One official lied to N.R. to persuade him to sign the deportation document. He told N.R. that if he signed the document, he would be reunited with S.N.M.M. at the airport in Phoenix, Arizona, from which the two would be sent back to Honduras together. It was based on this promise that N.R. signed the document. However, when N.R. was deported on or about May 30, 2018, he was not reunited with S.N.M.M.

82.    N.R. felt deceived and feared that what the agent had told him at the border might be true – that he would never see S.N.M.M. again. He felt like the worst father in the world, one that would abandon his own daughter, and he broke down in tears. After N.R. returned to Honduras, he had to wait approximately six weeks before he could speak to S.N.M.M. again. He did not know how to reach S.N.M.M. in Cayuga.

83.    Eventually N.R. received a call from another girl who was staying in Cayuga who told him that S.N.M.M. was crying every day and needed to get back to her family in Honduras. Soon after this, N.R. was able to speak to S.N.M.M. by phone. This was the first time he had communicated with her since the seven minute phone call they had while he was detained in California. S.N.M.M. was ultimately repatriated to Honduras on or about August 28, 2018.

84.    After N.R. returned to Honduras, he was unable to sleep for three days and he did not eat or drink. He had to be taken to the hospital to recover. For approximately a month, N.R. was unable to work because he was suffering from depression.

85.    S.N.M.M., who had turned nine while in U.S. custody, was severely traumatized by her experience. For about one month after her return, S.N.M.M. was unable to sleep, she would often cry suddenly for no reason, and she would scream "get away from me!" or "leave me alone!" in the middle of the night. Both N.R. and S.N.M.M. have received therapeutic treatment for trauma from a social worker at the Mennonite Social Action Committee, a local non-profit in Honduras.

**M.V.A. and B.V.M.**

86.    Two days after they crossed the border into Arizona in May of 2018, U.S. government officials took B.V.M. from her father M.V.A., who was not able to say goodbye to his daughter.

87.    B.V.M. was sent to Miami, Florida, where she was detained until approximately September 24, 2018.

88.    After being separated from his daughter, M.V.A. did not know where his daughter B.V.M. was, or anything about how she was, for about eight days.

89.    M.V.A. was finally able to speak with his daughter after approximately eight days, supervised by a social worker. M.V.A. felt afraid, sad, and in pain because of not knowing where his daughter was and because of their separation.

90.    M.V.A. was detained for about a week in a small unclean room in a Pima County, Arizona facility. He was only allowed to go outside for 30 minutes to 1 hour a day. The only times he was able to move outside the room was when detention officers moved detainees to eat, starting at around 4 a.m. for breakfast. If M.V.A. was asleep at mealtime

then he was not provided a meal. Furthermore, the food provided was inadequate, usually consisting of a vegetable and bread.

91. M.V.A. was deported without his daughter B.V.M. on around May 22, 2018. He did not know what was going to happen to B.V.M., who was left behind in the U.S.

92. M.V.A. and B.V.M. were not reunited until after B.V.M. was released from detention on or about September 24, 2018.

93. The psychological impact of M.V.A. and B.V.M.'s separation has been significant for both of them. B.V.M., a nine-year-old child at the time of her separation from her father, felt alone. She continually expressed her desire to be with her parents and cried anytime she spoke with her father or mother over the phone.

94. M.V.A. felt helpless. Neither M.V.A. nor B.V.M. knew what would happen with them or whether and when they might be reunited.

95. B.V.M. suffered and continues to suffer as a result of the separation from her father. She has difficulty sleeping, has not wanted to eat, has been distracted and fearful. She is less interested in maintaining her friendships and relationships with her family members, and she has been having difficulties in school.

96. M.V.A. also continues to suffer from the experience of being separated from his daughter. He is hurt by the actions of separating his child from him  and has been unable to move on from the experience.

### J.V.T. and V.E.V.H.

97. Immigration officials forcibly separated J.V.T. from his son V.E.V.H. at the

border in Arizona on or around May 19, 2018.

98.    At the time he was separated from his son by government official(s), J.V.T. was given only two minutes to say goodbye to V.E.V.H., causing both severe emotional distress.

99.    No one in V.E.V.H.'s family knew where he was for approximately two weeks after his separation from his father, and no one in V.E.V.H.'s family was able to communicate with him during this time.  After two weeks, V.E.V.H. was finally able to talk with his mother.

100.    J.V.T. did not know where his son was for about a month.  During the time he was detained, J.V.T. placed several requests to learn the whereabouts of his son but he was never given any information. J.V.T. was eventually able to make a call to his wife and only then did he learn that his son was in Kansas City, Kansas.

101.    In detention, J.V.T. would work approximately an hour and a half to earn $1 to be able to afford a two-minute phone call with his son.

102.    J.V.T. was detained for about eight months. During that time, immigration officials told him different things about whether he could be reunited with his son.

103.    Ultimately, J.V.T. and V.E.V.H. were deported together on or around January 17, 2019.

104.    The temperature in the facility where J.V.T. was detained was very cold and the food provided was inadequate and improper. Sometimes, he would get only one burrito a day to eat. Officials threatened and insulted him.

105.    J.V.T. developed a rash that eventually broke out in hives from the blankets he was given. He sent multiple requests for medical attention and was repeatedly denied. Eventually he was taken to a doctor who ordered he take his clothes off and be placed in a small freezing room with nothing but a small blanket to cover himself and some cream for the hives. Any officer who passed by the small room was able to see J.V.T. naked and cold. He was told to "deal with it." After about 24 hours inside the small freezing room, officers took him out of the room and put him back in the room he was in before.

106.    The psychological impact of J.V.T. and V.E.V.H.'s separation has been significant for both of them. J.V.T. felt deep sorrow and desperation at not knowing how his son was doing or even where he was.

107.    V.E.V.H., a 13-year-old child at the time of his separation from his father, felt miserable and alone. V.E.V.H. always cried during the few times he talked to J.V.T. on the phone. V.E.V.H. suffered and continues to suffer as a result of the separation from his father. He has difficulties sleeping, and continues to suffer from nightmares that make it difficult for him to sleep and he spends time crying due to the trauma. The separation changed him.

### E.A.G.V. and Y.Y.G.P.

108.    On or around December 2, 2017, after crossing the border into the United States in Arizona, E.A.G.V. was told by CBP – with no warning – that his daughter Y.Y.G.P. would be separated from him and that she would be going to some kind of a shelter. Upon hearing that his daughter would be taken away from him, E.A.G.V. fainted

from the shock and fell over. Y.Y.G.P. screamed and cried.

109.    E.A.G.V. was not told where his daughter would be taken, how long she would be there, if he could contact her, or if he could receive information about her. Y.Y.G.P. was simply taken away by the government agent(s). It was a heart-breaking moment for both E.A.G.V. and Y.Y.G.P., causing extreme distress and persistent pain and suffering.

110.    Despite his repeated requests to find out where his daughter was after the separation, no one in the U.S. government shared any information with E.A.G.V. Not knowing where his daughter was, E.A.G.V. felt tremendous sadness and desperation. Because of this, he was constantly worried about whether Y.Y.G.P. was safe, whether she was eating and sleeping properly, and how she was feeling. He felt extremely nervous, he lost weight, and he had difficulties sleeping.

111.    Y.Y.G.P. had been taken into a foster care/group home in Texas even though she had entered the country with her father. She did not know why she had been separated from her family and when, if ever, she would see them again. This caused her extreme fear and worry. During the time in which she was in Texas she did not want to eat; she was traumatized and sad. Y.Y.G.P. remained in Texas for nearly a month and a half, until on or around January 19, 2018, when she was flown to New York and was discharged to the care of her mother.

112.    When Y.Y.G.P. was reunited with her mother in Brooklyn, she was very different than she had been before her detention and separation from her father. She was

pale and her skin had a yellowish tinge. She had lost weight, she did not want to eat, she was extremely quiet, and she was hyper-alert to her surroundings. Y.Y.G.P. suffered from nightmares, including a nightmare which made her fall out of her bed.

113.    E.A.G.V. also suffered from lack of food during the period in which he was detained. For a significant period of time, E.A.G.V. (and the others detained with him) were fed only two meals a day, one meal of which was often a sandwich. The food provided to E.A.G.V. was inadequate and improper

114.    The psychological impact of E.A.G.V. and Y.Y.G.P.'s separation was significant for both of them. Y.Y.G.P., who was five years old child for most of her detention, felt fear, anxiety, and uncertainty every day of her separation from her father. E.A.G.V. also worried constantly about the well-being of his daughter and was in a state of despair during their separation. This was especially true for the two weeks in which he did not know where his five-year old daughter was, and when he had no idea about her safety.

115.    Because neither E.A.G.V. nor Y.Y.G.P.  knew what would happen with them or whether and when they might be reunited, both experienced escalating anxiety and stress during their time apart. Y.Y.G.P. continues to struggle as a result of the separation from her father. E.A.G.V. also continues to suffer from the experience of being separated from his daughter.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs)

116.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

117.    By engaging in the acts described in this Complaint, the federal employees, officials, and contractors referenced above engaged in extreme and outrageous conduct with an intent to cause, or in reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

118.    The conduct of Defendant, federal officials, and federal employees referenced herein was extreme and outrageous under the circumstances.

119.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

120.    The conduct described herein constitutes intentional infliction of emotional distress under Arizona law

121.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT II**
**NEGLIGENCE**
**(All Plaintiffs)**

122.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

123.    The federal employees, officials, and contractors referenced above had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

124.    They also had mandatory non-discretionary duties including, but not limited to, those imposed by the U.S. Constitution, the *Flores* consent decree, federal statutes, federal regulations, and international treaties that the U.S. has ratified, such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

125.    By engaging in the acts alleged herein, the federal employees, officials, and contractors acted unreasonably and failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

126.    The conduct described herein constituted negligence under Arizona law.

127.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

128.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

**COUNT III**
**NEGLIGENT SUPERVISION**
**(All Plaintiffs)**

129.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

130.    Plaintiffs suffered damages from foreseeable misconduct of employees, officials, and contractors supervised by the Defendant.

131.    The government's employees in supervisory roles have a duty to properly supervise federal employees, officers, and contractors and to oversee their treatment of

immigrants in their custody.

132.    The disregard for Defendant's own internal policies and standards by federal employees, officers, employees, and contractors also shows the supervisors were negligent in their non-discretionary duties to supervise individual employees, officers, and contractors.

133.    The conduct described herein constituted negligent supervision under Arizona law.

134.    The government's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Plaintiffs.

135.    As a proximate result of this negligent supervision, Plaintiffs suffered the injuries described herein.

136.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligent supervision.

**COUNT IV**
**ABUSE OF PROCESS**
**(All Plaintiffs)**

137.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

138.    The government's employees, officials, and contractors maliciously abused otherwise legally and properly issued legal processes within their control for purposes the legal processes never were intended to effect: traumatizing Plaintiffs and deterring future

migrants from seeking refuge in the United States.

139.   The government's conduct described herein constituted abuse of process under Arizona law.

140.   Plaintiffs. were injured by this misconduct, as described herein.

141.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

**COUNT V**
**LOSS OF CONSORTIUM (ARIZONA)**
**(All Plaintiffs)**

142.   Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

143.   Plaintiffs had a legal right to parent child consortium, which the government's employees, officials, and/or contractor violated.

144.   As a consequence of the government's actions described herein, Plaintiffs lost their capacity to exchange love, affection, society, companionship, comfort, care, and moral support.

145.   The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family in a normally gratifying way.

146.   The government's conduct described herein constituted loss of consortium under Arizona law.

147.   Plaintiffs were injured by this misconduct, as described herein.

148.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand as follows:

(1) Compensatory damages;

(2) Punitive damages;

(3) Attorneys' fees and costs; and

(4) Such other and further relief as the Court may deem just and appropriate.

**Dated:**    Brooklyn, NY
April 27, 2023

Patricia Kakalec
Hugh Baran
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Patricia@KakalecLaw.com
Hugh@KakalecLaw.com
*Admitted pro hac vice*

Robert McCreanor
Law Office of Robert D. McCreanor, P.L.L.C.
245 Saw Mill River Road
Suite 106
Hawthorne, NY 10532
(845) 202-1833
rmccreanor@rdmclegal.com
*Admitted pro hac vice*

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF FONT</u>

This is to certify that on April 27, 2023, I prepared the foregoing Complaint in Times New Roman, 13-point type in accordance with L.R. 5.1(C), and that I electronically filed the document with the Clerk of Court using the CM/ECF system.

Patricia Kakalec